# EXHIBIT A

## SUMMONS

| | |
|---|---|
| Attorney(s) | LAW OFFICE OF DAVID HONG |
| Office Address | 350 WEST 42ND STREET |
| | SUITE 19h |
| Town, State, Zip Code | NEW YORK, NY 10036 |
| Telephone Number | (646) 504-9494 |
| Attorney(s) for Plaintiff | NGEN SMOKE LLC ET AL. |

NGEN SMOKE LLC, RYAN ENG & ERIC WONG, Individually

and derivatively on behalf of Ngen Smoke LLC

Plaintiff(s)

Vs.
DAVID LAM

Defendant(s)

## Superior Court of New Jersey

Middlesex ▾ COUNTY

LAW DIVISION

Docket No:   ~~MID  L-005121  16~~

## CIVIL ACTION SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/pro se/10153 deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ  08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153 deptyclerklawref.pdf.

Clerk of the Superior Court

DATED: _____

Name of Defendant to Be Served:  DAVID LAM

Address of Defendant to Be Served:  7 River Rd., #4, Highland Park, NJ 08904; 106 Dayton St., Trenton, NJ

Revised 11/17/2014, CN 10792-English (Appendix XII-A)

# Directory of Superior Court Deputy Clerk's Offices
# County Lawyer Referral and Legal Services Offices

**ATLANTIC COUNTY:**
Deputy Clerk of the Superior Court
Civil Division, Direct Filing
1201 Bacharach Blvd., First Fl.
Atlantic City, NJ 08401

LAWYER REFERRAL
(609) 345-3444
LEGAL SERVICES
(609) 348-4200

**BERGEN COUNTY:**
Deputy Clerk of the Superior Court
Civil Division, Room 115
Justice Center, 10 Main St.
Hackensack, NJ 07601

LAWYER REFERRAL
(201) 488-0044
LEGAL SERVICES
(201) 487-2166

**BURLINGTON COUNTY:**
Deputy Clerk of the Superior Court
Central Processing Office
Attn: Judicial Intake
First Fl., Courts Facility
49 Rancocas Rd.
Mt. Holly, NJ 08060

LAWYER REFERRAL
(609) 261-4862
LEGAL SERVICES
(609) 261-1088

**CAMDEN COUNTY:**
Deputy Clerk of the Superior Court
Civil Processing Office
Hall of Justice
1st Fl., Suite 150
101 South 5th Street
Camden, NJ 08103

LAWYER REFERRAL
(856) 482-0618
LEGAL SERVICES
(856) 964-2010

**CAPE MAY COUNTY:**
Deputy Clerk of the Superior Court
9 N. Main Street
Cape May Court House, NJ 08210

LAWYER REFERRAL
(609) 463-0313
LEGAL SERVICES
(609) 465-3001

**CUMBERLAND COUNTY:**
Deputy Clerk of the Superior Court
Civil Case Management Office
60 West Broad Street
P.O. Box 10
Bridgeton, NJ 08302

LAWYER REFERRAL
(856) 696-5550
LEGAL SERVICES
(856) 691-0494

**ESSEX COUNTY:**
Deputy Clerk of the Superior Court
Civil Customer Service
Hall of Records, Room 201
465 Dr. Martin Luther King Jr. Blvd.
Newark, NJ 07102

LAWYER REFERRAL
(973) 622-6204
LEGAL SERVICES
(973) 624-4500

**GLOUCESTER COUNTY:**
Deputy Clerk of the Superior Court
Civil Case Management Office
Attn: Intake
First Fl., Court House
1 North Broad Street
Woodbury, NJ 08096

LAWYER REFERRAL
(856) 848-4589
LEGAL SERVICES
(856) 848-5360

**HUDSON COUNTY:**
Deputy Clerk of the Superior Court
Superior Court, Civil Records Dept.
Brennan Court House--1st Floor
583 Newark Ave.
Jersey City, NJ 07306

LAWYER REFERRAL
(201) 798-2727
LEGAL SERVICES
(201) 792-6363

**HUNTERDON COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
65 Park Avenue
Flemington, NJ 08822

LAWYER REFERRAL
(908) 236-6109
LEGAL SERVICES
(908) 782-7979

**MERCER COUNTY:**
Deputy Clerk of the Superior Court
Local Filing Office, Courthouse
175 S. Broad Street, P.O. Box 8068
Trenton, NJ 08650

LAWYER REFERRAL
(609) 585-6200
LEGAL SERVICES
(609) 695-6249

**MIDDLESEX COUNTY:**
Deputy Clerk of the Superior Court,
Middlesex Vicinage
2nd Floor - Tower
56 Paterson Street, P.O. Box 2633
New Brunswick, NJ 08903-2633

LAWYER REFERRAL
(732) 828-0053
LEGAL SERVICES
(732) 249-7600

**MONMOUTH COUNTY:**
Deputy Clerk of the Superior Court
Court House
P.O. Box 1269
Freehold, NJ 07728-1269

LAWYER REFERRAL
(732) 431-5544
LEGAL SERVICES
(732) 866-0020

**MORRIS COUNTY:**
Morris County Courthouse
Civil Division
Washington and Court Streets
P. O. Box 910
Morristown, NJ 07963-0910

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 285-6911

**OCEAN COUNTY:**
Deputy Clerk of the Superior Court
118 Washington Street, Room 121
P.O. Box 2191
Toms River, NJ 08754-2191

LAWYER REFERRAL
(732) 240-3666
LEGAL SERVICES
(732) 341-2727

**PASSAIC COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
Court House
77 Hamilton Street
Paterson, NJ 07505

LAWYER REFERRAL
(973) 278-9223
LEGAL SERVICES
(973) 523-2900

**SALEM COUNTY:**
Deputy Clerk of the Superior Court
Attn: Civil Case Management Office
92 Market Street
Salem, NJ 08079

LAWYER REFERRAL
(856) 935-5629
LEGAL SERVICES
(856) 691-0494

**SOMERSET COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
P.O. Box 3000
40 North Bridge Street
Somerville, N.J. 08876

LAWYER REFERRAL
(908) 685-2323
LEGAL SERVICES
(908) 231-0840

**SUSSEX COUNTY:**
Deputy Clerk of the Superior Court
Sussex County Judicial Center
43-47 High Street
Newton, NJ 07860

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 383-7400

**UNION COUNTY:**
Deputy Clerk of the Superior Court
1st Fl., Court House
2 Broad Street
Elizabeth, NJ 07207-6073

LAWYER REFERRAL
(908) 353-4715
LEGAL SERVICES
(908) 354-4340

**WARREN COUNTY:**
Deputy Clerk of the Superior Court
Civil Division Office
Court House
413 Second Street
Belvidere, NJ 07823-1500

LAWYER REFERRAL
(908) 859-4300
LEGAL SERVICES
(908) 475-2010

LAW OFFICE OF DAVID S. HONG
350 West 42nd Street, Suite 19H
New York, New York 10036
646-504-9494
david@davidhonglaw.com
Attorneys for Plaintiffs

_____X

| | | |
|---|---|---|
| NGEN SMOKE LLC,RYAN ENG | : | SUPERIOR COURT OF NEW JERSEY |
| and ERIC WONG, | : | LAW DIVISION |
| Individually and derivatively on behalf | : | MIDDLESEX COUNTY |
| of Ngen Smoke LLC | : | DOCKET NO. |
| Plaintiffs, | : | |
| | : | Civil Action |
| v. | : | |
| | : | COMPLAINT |
| | : | |
| DAVID LAM, | : | |
| | : | |
| Defendant. | : | |

_____X

Plaintiffs Ngen Smoke LLC, and Ryan Eng and Eric Wong, individually and derivatively on behalf of Ngen Smoke LLC, for their Verified Complaint against David Lam allege as follows:

## **PARTIES**

1. Plaintiff Ngen Smoke LLC ("Plaintiff" or "Ngen") is a limited liability company duly organized under the laws of New Jersey and authorized to transact business in the State of New Jersey, with a business address of 63 Buck Road, East Brunswick, New Jersey, 08816.

2. Plaintiff Ryan Eng ("Eng") is a resident of East Brunswick, New Jersey.

3. Plaintiff Eric Wong ("Wong") is a resident of East Brunswick, New Jersey.

4. Defendant David Lam ("Lam") is a resident of Highland Park/Trenton, New Jersey.

## VENUE

5.  Venue is properly laid in Middlesex County, New Jersey insofar as the LLC partnership
    that is the subject of this dispute is located in, and the cause of action arose in,
    Middlesex County, New Jersey, as more fully set forth below.

## PRELIMINARY STATEMENT

6.  This matter derives from the breakdown and betrayal of a partnership as between young
    entrepreneurs – where Eng and Wong conceived of certain creative business concepts in
    the electronic hookah and vaping industry though decades of friendship, interest,
    aptitude and brainstorming.  Eng and Wong brought on a minority member Lam whom
    they met via Facebook into their business who then engaged in misconduct, made
    intentional and negligent misrepresentations to the partnership, abandoned his
    responsibilities to the partnership, and ultimately took a series of actions to interfere
    with, expose, and damage the partnership in extortionate attempts to receive
    compensation and future rights well in excess of what he is entitled and what the
    Plaintiffs can afford.

7.  Lam – a self-proclaimed engineer – earned the trust of Eng and Wong who were first
    time entrepreneurs – and became "responsible" for the engineering and technology
    aspects of the electronic hookah and vaping business that is the primary purpose of the
    partnership.  In reliance on Lam's misrepresentations as to his capacities in engineering
    and commitment to the business, Plaintiffs entered into an Operating Agreement
    ("Agreement") with him in March 2015.

8.  Soon after the execution of the Agreement, Lam became a different person; he acted in a
    manner grossly derelict of his duties, in lieu of devoting his time and effort to
    expeditiously executing the business purposes of the partnership, Lam instead focused

2

his attention on other part-time jobs and business ventures, one of which ultimately conflicted with and exposed the partnership to great potential liability, thus unduly prolonging the completion of the start-up phases of the partnership. Plaintiffs also had shocking discoveries as to Defendant's background, history and conduct that exposed a pattern and practice of lies Defendant had told to Plaintiffs.

9. During the business relationship, Plaintiffs repeatedly urged Lam to timely complete his obligations, and Lam thumbed his nose at the demands and continuously insincerely apologized with no true intention on ever performing his promises as his primary motive was to receive long term gains from Eng, Wong and Ngen without ever fairly contributing as agreed between the parties. Because of Lam's misrepresentation of his engineering background and lies about his academic achievements, third party vendors were given more responsibilities to perform Lam's job.

10. Lam acted in reckless disregard of his fiduciary duties to the partnership, ceased to work with Plaintiffs for months, tending to his own personal matters and other business ventures instead. For all purposes and intents, he has abandoned the partnership while unjustly utilizing his role in the company for other business gains and deceiving his own family (who put forth the initial capital contribution to support David) as to his business developments, at the expense of Ngen, Eng, and Wong.

11. It is against this backdrop that Eng and Wong, individually and derivatively on behalf of Ngen Smoke LLC, seeks judicial intervention. Despite multiple attempts at mediation and at reaching an amicable resolution, Defendant refuses to separate himself from the LLC in any reasonable way, making this action necessary.

## STATEMENT OF MATERIAL FACTS

12. The LLC was formed pursuant to a Certificate of Formation dated and filed with the State of New Jersey Department of Treasury on or about October 29, 2014.  The Operating Agreement ("Agreement") was subsequently signed on or about March 20, 2015.

13. Although the Agreement provided that each member shall contribute $200,000, Plaintiffs Eng, Wong and Defendant Lam excused themselves from any penalties for late contribution.  Each member of the business contributed $73,000 initially utilizing family support and savings as the members were very young entrepreneurs in the early stages of career development.  Lam contributed last and reluctantly.

14. At the same time of the Agreement, Plaintiff Eng, Wong and Defendant Lam also entered into an oral contract (the "oral agreement") for the operation of Ngen which contained the following terms and understanding:

    a) As each member utilized third party and family support and each of the families are Chinese-American immigrants contributing hard earned savings for the success of the next generation, the three young men understood and agreed that hard work and sweat equity would be required of all three members to achieve business success.

    b) The three young men agreed that they would personally be officers and employees of the business to make business goals achievable at lower cost.

    c) As Eng, Wong, and Lam were engaged in a non-service/product industry, substantial funds would be necessary in the initial start up stages and Ngen had no budget for any substantial employee or contractor support.   The members and

4

officers even utilized the home address of their parents to conduct business to decrease costs.

d) Eng, Wong and Lam clearly agreed upon a 40 hour work week which would be necessary for the success of the business.  While other part-time work was acceptable (and necessary primarily for the additional financial contribution into Ngen), parties agreed that other work would be in addition to the required 40 hour weekly contribution to Ngen and could not conflict with the business purposes of Ngen.  Working full time for Ngen was the condition precedent to membership under the Agreement as all three members did not make adequate financial contribution – and all three young men were supposed to work to earn their membership rights.  Plaintiff Eng and Wong did so and Defendant Lam did not.

15. The Agreement provided that the Board of managers would be appointed at the sole discretion of the members and headed by the Chairman of the Board, Eng.  The members may determine to remove any manager and any manager may be removed with or without cause.  66% of the Managers shall constitute a quorum on any such decisions.  Any officer elected or appointed by the Members of Board may be removed any time with or without cause or by the affirmative vote of the majority of the Board.

16. Under these terms, Plaintiffs and Defendant agreed that (1) Eng would serve as Chairman, Secretary and Treasurer, (2) Wong would serve as Chief Marketing Officer, and (3) Lam would serve as Chief Technology Officer.  Under the Agreement, the Chief Technology Officer is responsible for all engineering and product design and development, supply chain logistics, and anything related to information technology.

17. Eng had multiple titles and authority because he is the founder of the Ngen business concept and entity.  Wong had the highest percent interest in Ngen as he contributed the most financially and also lent his home for Ngen to use for business operations.  Lam was the last member to join Ngen, knew Wong and Eng for a shorter period of time than the two creators who knew one another for decades, and contributed the least from the get-go in terms of business ideas and structure.  Therefore, it was especially critical for Lam to demonstrate his business contribution through work performance in his alleged know-how in engineering and technology subsequent to Agreement execution.  In order to earn equal rights, Lam needed to have made more financial contribution or performed significant engineering/technology work for Ngen.  Neither happened and in fact Lam worked the least out of the three young men and could not perform his engineering and technology duties.  Worst of all, Lam hid his incapacities for a long time from his partners and lied about earning an engineering degree from Rutgers University.  Because of Lam's misrepresentations and lies, Ngen had no choice but to hire Tri-Power Engineering and other vendors to assist in executing Lam's role, which occurred only after Eng and Wong finally discovered Lam's lies, which was very late in the process, delaying the life cycle of the product.  As the business concept was being quickly replicated in the market and the FDA has since passed new regulations that are not favorable to Ngen, Lam's actions were incredibly harmful to the company and may cause its ultimate demise.

18. Pursuant to the oral agreement, Lam represented that he was capable of handling the engineering needs of the company, that he had graduated from Rutgers University with an engineering degree, and that he had sufficient experience.  Pursuant to the oral

agreement, Lam agreed to complete the design in four (4) months. After eight (8) months of doing business with Lam, Plaintiffs had to rely more heavily on another company Tri-Power Design LLC to finish tasks that Lam was supposed to perform himself. Plaintiffs spent $70,000 on Tri-Power Design LLC and continue to spend further funds on what Lam represented he could perform. In short, Ngen spent more than Lam's $73,000 investment from very early on as additional business expenses to achieve the performance goals Lam promised he could deliver personally.

19. Plaintiffs introduced Lam in business meetings to investors and vendors, amongst others, as an engineer who graduated from Rutgers University. All the while, Lam knew this was a lie and continued to represent that he was a qualified environment engineer both on public websites and in conversations.

20. Even subsequent to the retention of Tri-Power Design LLC, Lam continued to obstruct the process by ignoring Tri-Power's request for a timeline to create a prototype months before an important Las Vegas trade show where the prototype would be needed. Plaintiffs then paid rush fees for one (1) prototype to be able to use it for the photos and video and to launch an Indiegogo campaign. Obviously, Ngen operated at sub-optimal standards. After the show in Las Vegas, Lam did not return equipment on time and caused Plaintiffs to arrive late at the airport. Plaintiffs and Defendant ended up staying an extra night in Las Vegas as a result. Preventable business losses of this type were frequent during Lam's tenure at Ngen.

21. In June 2015, there were eight (8) emails, text messages and/or other communications with Lam where he either showed up late to meetings, completely did not show up, or completely failed to contribute. In February 2015, there were six (6) such instances. In

January 2015, there were five (5) such instances.  In August 2014, there were 15 such instances.  All meetings and appointments were agreed upon by Lam in advance and times he had set up himself.  Although Eng and Wong typically worked full 9 am – 6 pm days on the Ngen venture, Lam was often absent focusing on his other ventures and jobs and when he decided to participate, he was often late or distracted.

22. In July 2015, Plaintiffs discovered that Lam had started a Sharksuit venture to replicate the Left Shark featured at the 2015 Super Bowl halftime show with pop star Katy Perry. The lack of judgment and detriment to Plaintiffs became shocking.  On Twitter, Facebook and other social media sites where Plaintiffs advertise heavily and are the primary methods of marketing for Ngen, Plaintiffs discovered posts and messages on their business pages such as (a) "Beware. One of the 3 'entrepreneurs' has scammed…" (b)"contributes wondering if our money was used 2 support @NGENSMOKE instead of our orders? We know, David. #fraud#Indiegogo" (July 10, 2015) (c) "David Lam of @ NGENSMOKE still has not issued refunds for #Sharksuit @Indiegogo campaign. Not updating as promised. #scam $92,000+ still missing." (August 16, 2015), and (d) "He is not an environmental engineer…especially since he dropped out of college.  He's not very eco-friendly either.  That might've been him once, but not anymore..  He's a bit of a misleading guy.  There's a bit more information I'd like to add about this…I've been an acquaintance of Dave for quite some time now and it's a shame for him to have done such a thing.  When I saw on fb how he started a kickstarter, I immediately knew what his intentions were – keeping as much money as he could and maybe…Maybe producing some sort of the promised shark costume.  He's done similar money schemes before. Anything to get money.  He's a great guy with awesome ideas but poor execution

driven by money.  I'm glad someone started a petition.  I just really wish he fell[sic] through with his promise."

23. Previously, Lam had shown that he was willing to use Ngen's bank account to purchase tickets for a scalping business he had.  Therefore it was very plausible that Ngen would become and has become responsible for Lam's involvement in the Shark Suit venture.

24. During the Shark Suit venture, Lam disclosed certain things to Plaintiff Eng about his handling of that project that were very troubling and became even more troubling as negative media attention began to rise.

25. Through the Shark Suit scandal and public posts, Plaintiffs discovered that Lam had lied about his engineering background.  Lam could have informed his partners earlier to avoid this exposure but he chose not to.

26. On July 28, 2015, a Washington Times reporter called Plaintiff Eng and Wong after having spoken to Lam. To make matters worse, he references his involvement with Ngen to seek personal vindication thereby jeopardizing the company.

27. On August 13, 2015, the Washington Times article appeared entitled "Crowdfunding websites exploited by scam artists as popularity soars" which is attached in Exhibit A. Notably, these sections of the article show Lam's reckless disregard for Ngen in the story he told the reporter: "The night Left Shark made a splash at the Super Bowl, David Lam wasn't even watching the game…Mr. Lam said he had no experience crowdfunding a campaign when he sat down at 2 a.m. that morning and began hammering out the details of his idea on Indiegogo…But the momentum started to fade, and Mr. Lam had less time to dedicate to the project as work ramped up on a different startup [Ngen Smoke] venture with which he was already involved." "Donors questioned whether Mr. Lam had

taken the money and run.  People posted information online about him.  They tracked

down and bad-mouthed his startup.  He said his partners [Ryan Eng and Eric Wong]

eventually asked him to distance himself from the crowdfunding project because of

concerns about bad publicity."

28. The suggestion that Ngen had anything to do with Lam's Shark Suit venture was nothing

but the truth.  The fact was that Lam was acting recklessly and irresponsibly in that

venture, with Ngen, and apparently many previous people he had worked with and

interacted with.

29. Additionally Lam launched the Shark Suit venture and scam on Indiegogo which was

the same platform Ngen used for its marketing campaign.

30. On August 1, 2015, Plaintiffs' employment counsel met with Lam to mediate their

dispute prior to litigation.  After briefly informing Lam of Plaintiffs' intention to separate

with him, employment counsel left for Eng, Wong and Lam to discuss privately and

such conversation went on for 1.5 hours.  At this point, Plaintiffs were willing to return

Lam's entire $73,000 investment to him or his parents for an amicable separation

although the damage Lam caused far outweighed his investment.

31. During the 1.5 hour  August 1, 2015 conversation between Eng, Wong and Lam which

was recorded and as agreed to by all three men, Lam admitted to (a) lying to his partners

about graduating from Rutgers University, (b) the Shark Suit venture being a lapse in

judgment both to his partners and to his parents, (c) not being qualified to be a partner at

Ngen and that he should not be a partner until some time in the future, (d) that he *will*

commit to Ngen in the future because he has not in the past (e) deserving to have his

percentage cut back and (f) being willing to leave the company if his partners wanted

him to.  Eng and Wong repeatedly told Lam in no uncertain terms he must leave Ngen.
Interestingly, in all his asking for forgiveness and begging to continue in Ngen, Lam
never offered one idea or plan as to what he will do for Ngen in the future.  Lam
admitted his interest was based on his desire to be successful and making his parents
proud because nothing else had worked out for him in life.  Lam had dropped out of
school and failed in his other ventures.  Lam expressed fear that his parents would lose
confidence in him again and he'll be "back out on the streets".

32. During the entire time parties worked together, Lam had another Photo Booth venture
that he focused on further distracting him.

33. Subsequent to the August 1, 2015 meeting, Lam called Ngen's engineering team and
asked for designs.

34. Lam retained counsel and subsequently took an entirely different position than his
recorded position on August 1, 2015 which will serve as evidence in this litigation.

35. Ultimately on September 24, 2015, Lam made a filing to the U.S.P.T.O. asserting that he
somehow unilaterally owned the patent rights to Ngen's product and that Ngen's patent
lawyer was conflicted simply because he was no longer part of the company.  Lam made
such filings after verbal and written representation from patent counsel that such a filing
would be inappropriate, that Lam does not personally own any intellectual property
which is instead owned by the company, and that counsel represented the company and
not Lam individually and therefore there was no conflict of interest.  Similar
representations have been given to Lam's counsel by employment counsel.  However in
a manner entirely meant to be obstructive and damage Plaintiffs, Lam filed a petition
with the U.S.P.T.O. which is not the appropriate forum to adjudicate partnership

11

disputes, just to menace, threaten, bully and hurt Plaintiffs and the company he claims he still wants to be a part of.

36. When asked to prove why Lam felt he had ownership over the intellectual property, his counsel could not provide a substantive answer. Plaintiffs has evidence that all "engineering" and "intellectual property" created were done by third party vendors, Eng and Wong. All drawings and submissions made to the U.S.P.T.O. were made by Tri-Power Design LLC and/or another engineer. Lam will be completely unable to demonstrate his unique or original contribution to the patent applications of the Company.

37. Under the Agreement, The Board and the members had an obligation not to guarantee Ngen or become obligated for the debts of any other person or hold its credit as being available to satisfy the obligation of others. Under the Agreement, Lam had an obligation not to pledge Ngen assets for the benefit of any other person or make any loans or advances to any person. Under the Agreement, Lam was obligated to correct any known misunderstanding regarding its separate identity and observe all other limited liability formalities.

38. The Agreement prohibited any board action to engage directly or indirectly in any business or activity other than as required or permitted to be performed pursuant to the Company's purpose in vaping.

39. Under the Agreement, each manager and officer had a fiduciary duty of loyalty and care similar to that of managers and officers of business corporations organized under the law of New Jersey. Under the Agreement, the managers and officers shall refrain from dealing with the Company in the conduct of the Company's business as or on behalf of a

party having an interest adverse to the Company unless a majority consents. Under the Agreement, the managers and officers shall refrain from competing with the Company in the conduct of the Company's business unless a majority consents. The actions Lam took in filing an opposing patent application were unbelievable.

40. Under the Agreement, managers and officers must respect the nature of privileged and confidential information and not disclose any such information, either directly or indirectly to any other person or entity except as authorized and not use such information for personal gain.

41. In compliance with the Agreement, Plaintiff Eng and Wong mediated with Lam on August 1, 2015, March 29, 2016, April 10, 2016 and April 24, 2016. During the last of these two meetings, Lam's family members also participated.

42. Lam continues to delay in vindictive and desperate hope that Eng and Wong will somehow accept his dilatory and fraudulent tactics and either accept his unjustified role as a member/partner or promise him excruciatingly high returns in the future that Ngen has no hope of practically meeting. He intends to be obstructive at every turn and utilize personal leverage over Eng and Wong by refusing to act – both in the commission of the business purpose before the breakdown and now in the refusal to separate with any reasonable and tangible resolution.

## FIRST CAUSE OF ACTION
(Wrongful Conduct in violation of N.J.S.A. 42:2C-46(e)(1))

43. The above paragraphs are repeated, realleged and incorporated as if set forth fully herein.

44. Defendant Lam has engaged in wrongful conduct that has adversely and materially affected Ngen's activities contrary to N.J.S.A. 42:2C-46(e)(1).

45. Ngen had no alternatives but to file this legal action to compel Defendant Lam to leave the company and limits its exposure to liability due to Defendant's actions.

46. Ngen incurred substantial legal fees and vendor fees to complete/fix Lam's work among other damages.

47. Defendant Lam's wrongful conduct has adversely and materially affected the Company's activities, contrary to N.J.S.A. 42:2C-46(e)(1).

### SECOND CAUSE OF ACTION
(Breach of Operating Agreement/ N.J.S.A. 42:2C-46(e)(2))

48. The above paragraphs are repeated, realleged and incorporated as if set forth fully herein.

49. Contrary to N.J.S.A. 42:2C-46(e)(2), Defendant Lam has willfully and persistently committed material breaches of the Operating Agreement.

50. Section III(B) of the Operating Agreement ("Agreement") provides that Defendant Lam shall make a $200,000 initial contribution to the Company on or before June 1, 2015.

51. Section VI of the Agreement provided that the Board of Managers would be appointed at the sole discretion of the members and headed by the Chairman of the Board, Eng. The members may determine to remove any manager and any manager may be removed with or without cause. 66% of the Managers shall constitute a quorum on any such decisions. Under Section VII of the Agreement, any officer elected or appointed by the Members of Board may be removed any time with or without cause or by the affirmative vote of the majority of the Board.

14

52. Under Section VII(A)(7) of the Agreement, the Chief Technology Officer shall be responsible for all engineering and product design and development, supply chain logistics, and anything related to information technology.   Lam was the Chief Technology Officer.

53. Under Section VI(G) of the Agreement, the Board and the members had an obligation not to guarantee Ngen or become obligated for the debts of any other person or hold its credit as being available to satisfy the obligation of others.  Under this section, Lam had an obligation not pledge Ngen assets for the benefit of any other person or make any loans or advances to any person.  Under this section, Lam had an obligation to correct any known misunderstanding regarding Ngen's separate identity and observe all other limited liability formalities.

54. Under Section VI(H) of the Agreement, it was a prohibited action of the board to engage directly or indirectly in any business or activity other than as required or permitted to be performed pursuant to the Company's purpose in vaping.

55. Under Section VIII of the Agreement, each manager and officer had a fiduciary duty of loyalty and care similar to that of managers and officers of business corporations organized under the law of New Jersey.  Under this section, the managers and officers shall refrain from dealing with the Company in the conduct of the Company's business as or on behalf of a party having an interest adverse to the Company unless a majority consents. Under this section, the managers and officers shall refrain from competing with the Company in the conduct of the Company's business unless a majority consents. Under this section, managers and officers must respect the nature of privileged and confidential information and not disclose any such information, either directly or

indirectly to any other person or entity except as authorized and not use such information for personal gain. Under this section, Lam had non-compete and non-solicitation provisions lasting 10 years after his separation from Ngen.

56. Defendant Lam breached the Agreement by failing to contribute the required initial contributions to the Company.

57. Lam breached the Agreement as further enumerated in Paragraphs 18 through 41 of this Verified Complaint.

58. Defendant Lam has willfully and persistently committed material breaches of the Operating Agreement, contrary to N.J.S.A. 42:2C-46(e)(2).

## THIRD CAUSE OF ACTION
(Conduct contrary to the Company's Activities Making It Not Reasonably Practicable to Carry on the Activities with Defendant as a Member pursuant to N.J.S.A. 42:2C-46(e)(3))

59. The above paragraphs are repeated, realleged and incorporated as if set forth fully herein.

60. Contrary to N.J.S.A. 42:2C-46(e)(3), Defendant Lam has engaged in conduct relating to the company's activities which makes it not reasonably practicable to carry on the activities with him as a member.

61. Defendant Lam has engaged in conduct relating to the company's activities which makes it not reasonably practicable to carry on the activities with Lam as a member contrary to N.J.S.A. 42:2C-46(e)(3).

## FOURTH CAUSE OF ACTION
(Dissociation pursuant to N.J.S.A. 42:2B-24b(3)(a)-(c))

62. The above paragraphs are repeated, realleged and incorporated as if set forth fully herein.

63. Among other things, Defendant Lam's wrongful actions and misappropriations of opportunity and time deprived Plaintiffs of needed working capital and competitive timing, which, in turn, retarded the growth of Ngen's business.

64. Lam, as a member of Ngen, engaged in wrongful conduct that adversely and materially affected Ngen's business, as provided for in N.J.S.A. 42:2B-24b(3)(a).

65. Lam's actions constitute willful and wanton material breaches of the Operating Agreement as enumerated in the Second Cause of Action, as provided for in N.J.S.A. 42:2B-24b(3)(b).

66. Lam's conduct makes it not reasonably practicable to carry on Ngen's business with Lam as a member of Ngen, as provided for in N.J.S.A. 42:2B-24b(3)(c).

67. Equity demands that Lam be dissociated from membership in Ngen and order him to sell his interest to Ngen for a fair and reasonable price in light of his wrongful acts and the damage he has caused to Ngen, Eng and Wong.

68. Lam should be dissociated as a member of Ngen, and Ngen asks this court to dissociate Lam from Ngen.

**FIFTH CAUSE OF ACTION**
(Disqualification pursuant to N.J.S.A. 42:2C-46(d)(1))

69. The above paragraphs are repeated, realleged and incorporated as if set forth fully herein.

70. Pursuant to N.J.S.A 42:2C-46(d)(1), an LLC member may be expelled by the unanimous consent of the other members if it is unlawful to carry on the LLC's activities with that person as a member.

71. Defendant Lam at all pertinent times was a minority member of the LLC and its Chief Technology Officer.

72. Defendant's unauthorized practice in engineering without appropriate credentials and licensure was noncompliant with applicable laws and regulations governing technology and engineering work in the electronic hookah and vaping industry.

73. Defendant's unauthorized and undisclosed activities for the Sharksuit venture and other ventures (but at the same time acting under the direct or indirect auspices of Ngen) were noncompliant with applicable laws and regulations governing work and business in the electronic hookah and vaping industry.

74. Defendant has made it impossible for Plaintiffs to determine whether Defendant's outside and unauthorized practices, which includes holding himself out as an engineer and engaging in other illegal, fraudulent or other questionable business practices has been compliant with law.

75. Defendant has been lawfully disqualified as a member of the LLC.  He is no longer entitled to the benefits of the parties' prior Operating Agreements or other oral agreements.

76. Defendant has refused to cease his non-compliant activities and continues to take actions to deliberately be destructive with the business including but not limited to his September 24, 2015 opposition filing with the U.S.P.T.O.

77. Defendant has refused to separate from the LLC.

78. As a direct and proximate result of Defendant's misconduct, Plaintiffs have been damaged.

<h2 style="text-align:center">SIXTH CAUSE OF ACTION</h2>
(Breach of Statutory Duty of Care and Loyalty pursuant to N.J.S.A. 42:2C-39)<br>(Breach of Fiduciary Duties)

79. The above paragraphs are repeated, realleged and incorporated as if set forth fully herein.

80. The statute, N.J.S.A. 42:2C-39 entitled "Standards of Conduct for Members and Managers" established that Defendant Lam owed the Plaintiffs and its members a duty of care and loyalty and fiduciary duties in his conduct as a member of the LLC.

81. As part of his statutory duties as a member of the LLC, Defendant had a duty to refrain from engaging in grossly negligent or reckless conduct, intentional misconduct or knowing violations of law.

82. Defendant breached his statutory and fiduciary duties of care and loyalty in material ways because, among other things he was participating in other potentially competitive and dangerous business ventures that are destructive to the reputation and assets of Ngen, he engaged in material misrepresentations to Ngen and to the American public as to his professional and business capacities, and he deprived the LLC of its ability to fully control and regulate Lam's portion of the business.

83. Defendant has also exposed the LLC to unknown liabilities, and he has adversely affected the LLC's activities and business.

84. Defendant has been lawfully disqualified as a member of the LLC. He is no longer entitled to the benefits of the parties' Operating Agreement or oral agreements.

85. Defendant has persisted and continued his unauthorized and wrongful activities. He refuses to separate from the LLC.

86. As a direct and proximate result of Defendant's misconduct and breach of duty of care and loyalty, and breach of fiduciary duties, Plaintiffs have been damaged.

## SEVENTH CAUSE OF ACTION

(Misappropriation of Ngen's Intellectual Property and Business Assets; Conversion, and
Declaratory Judgment on Ngen's Ownership of its Intellectual Property and Business Assets)

87. The above paragraphs are repeated, realleged and incorporated as if set forth fully herein.

88. Defendant converted a patent application that was created and used by Ngen to his personal use.

89. Despite specific instruction from Ngen, Eng and Wong to register all patents, trademarks and other intellectual property with the U.S. Patent and Trademark Office in Ngen's name rather than his own name, Defendant still utilized every effort to use his own name for ownership wherever he could.

90. Defendant took these actions even knowing several third party vendors including Tri-Power Design LLC had to be engaged to create the engineering, technology and intellectual property work that was originally his responsibility and expected contribution to Ngen. Defendant took these actions also knowing Ngen had paid for these vendors for the work and owned the intellectual property and business assets that he attempted to misappropriate. Defendant also attempted to garner personal ownership of intellectual property and business assets.

91. Defendant Lam has also utilized Ngen's reputation, good will and business assets for his personal gain in other business ventures.

92. Defendant's action in registering Ngen's intellectual property with his own name constitutes a misappropriation and conversion of Ngen's intellectual property. Defendant's action in using Ngen's reputation, good will and business assets for his other business ventures constitutes a misappropriation and conversion of Ngen's business assets.

20

93.  Defendant's registration of the Ngen patent and intellectual property in his own name was unauthorized by the owner of these marks, Ngen.  Defendant's usage of Ngen reputation, good will and business assets for his own gain was also unauthorized by Ngen.

94.  Ngen is entitled to a declaratory judgment to those patents and marks that belong to the company and ordering any rights that Defendant may have seized illegally to be transferred back to the company.

95.  Ngen is entitled to a declaratory judgment that all intellectual property in the U.S.P.T.O. Application No. 29/514,974 filing belongs to Ngen and ordering Defendant Lam to transfer any ownership or potential ownership to the application to Ngen.

## EIGHTH CAUSE OF ACTION
### (Fraud)

96.  The above paragraphs are repeated, realleged and incorporated as if set forth fully herein.

97.  Defendant made knowingly false statements to Plaintiffs Ngen, Eng and Wong about his academic background, engineering and technology abilities, and the status of his work for Ngen.

98.  Defendant made knowingly false statements about Ngen, Eng and Wong in an attempt to preserve his own innocence in a Sharksuit venture where his business misrepresentations were inexcusable to the public.

99.  Defendant made knowingly false statements to the U.S.P.T.O as to his ownership rights to Ngen's intellectual property.

100. Defendant made the knowingly false statements to Ngen, Eng and Wong and third parties with the intention that they are relied on to give him rights and benefits that he did not deserve.

101. Plaintiffs Ngen, Eng and Wong relied to their detriment on the false statements made to them by Defendant Lam and as a result, Lam's fraud continued undetected for close to two (2) years.

102. Plaintiffs Ngen, Eng and Wong have suffered damages as a result of Lam's fraud, including lost profits, lost business opportunities, consequential and compensatory damages, among other damages.

103. Plaintiffs Ngen, Eng and Wong are also entitled to an award of punitive damages against Lam for his willful and wanton conversions of their intellectual property, business assets and money.

### NINTH CAUSE OF ACTION
(Breach of Contract)

104. The above paragraphs are repeated, realleged and incorporated as if set forth fully herein.

105. Lam's actions as previously alleged constituted a breach of the Operating Agreement and oral agreements.

106. Some of all of Defendant's unauthorized and deceptive activities were illegal.

107. Defendant has deprived Ngen, Eng and Wong of the ability to safeguard their electronic hookah and vaping practice by enforcing necessary controls over Lam's actions.

108. Defendant has refused to provide candid and complete information to the LLC's members regarding all of his outside activities and other business ventures.

109. Defendant has deprived the LLC of the full value of his services.

110. Defendant has engaged or is engaging in conduct relating to Ngen's activities which adversely affects the LLC's business, and which makes it no reasonably practicable to carry on the LLC's activities with defendant as a member.

111. By his concealed and unauthorized activities, defendant has materially breached and repudiated the Operating Agreement and oral agreements.

112. Defendant's disqualification and dissociation is necessary to protect plaintiff, its business and the public's interest in compliance with all laws and regulations concerning the practice of electronic hookah and vaping.

113. Defendant has been lawfully disqualified and dissociated for cause as a member of the LLC.  Once he repudiated the Operating Agreement and oral agreement, Defendant was no longer entitled to the benefits of the parties' prior contracts.

114. Defendant has refused to separate from the LLC despite the members' inability to reconcile differences and function together after lengthy meetings spanning from August 1, 2015 to the present, necessitating this action.

115. Ngen, Eng and Wong have suffered damages as a result of Lam's breaches of contract, including lost profits, lost business opportunities, consequential and compensatory damages, among other damages.

**TENTH CAUSE OF ACTION**
(Unjust Enrichment)

116. The above paragraphs are repeated, realleged and incorporated as if set forth fully herein.

117. Defendant has been unjustly enriched by his wrongful taking of intellectual property, business assets, goodwill, reputation, know-how, business opportunities and his actions in currently holding himself as a partner of Ngen and refusing to separate.

23

118. Defendant has received a benefit and retention of that benefit without payment would be unjust.

119. Defendant seeks compensation and future business opportunities and preferential treatment for the return of his member interest that is unreasonably in excess of any amount provided in the parties' prior Operating Agreement and oral agreements which Defendant repudiated.

120. To the extent that any remedy sought by Defendant is beyond the members' expressed contractual intent, Defendant sought to be unjustly enriched.

121. Defendant is a wrongdoer and as such he should not be rewarded.

122. Defendant has refused to cease his non-compliant activities and refuses to separate from the LLC.

123. Plaintiffs Ngen, Eng and Wong have suffered damages to the extent of Lam's unjust enrichment, including lost profits, lost business opportunities, consequential and compensatory damages and among other damages.

## ELEVENTH CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

124. The above paragraphs are repeated, realleged and incorporated as if set forth fully herein.

125. Defendant's wrongful taking of intellectual property, business assets, goodwill, reputation, know-how, business opportunities and his actions in currently holding himself as a partner of Ngen and refusing to separate constitutes a breach of the covenant of good faith and fair dealing which is an implied term of the Operating Agreement, oral agreements, and LLC law in New Jersey.

126. Defendant has separately and persistently breached his statutory and common law covenants of good faith and fair dealing.

127. By virtue of entering into an Operating Agreement and oral agreements, Defendant owed to Ngen and his partners a duty to act in good faith.

128. Notwithstanding, Lam has acted with bad faith, bad motives, deception, evasion, dishonesty, gross negligence, or has engaged in deception or evasion in the performance of his agreements.

129. Lam's conduct fails to conform to a manner consistent with the reasonable expectations of the parties entering into the agreements and has denied Ngen, Eng and Wong of the benefit of the initially intended bargain with respect to the agreements.

130. Defendant has been lawfully disqualified and disassociated as a member of the LLC. Once he repudiated the Operating Agreement and oral agreements, Defendant was no longer entitled to the benefits of the parties' prior contracts.

131. Defendant refuses to separate from the LLC.

132. Plaintiffs Ngen, Eng and Wong have suffered damages as a result of Defendant's breaches, including lost profits, lost business opportunities, consequential and compensatory damages, among other damages.

### TWELFTH CAUSE OF ACTION
(Negligent Misrepresentation)

133. The above paragraphs are repeated, realleged and incorporated as if set forth fully herein.

134. Defendant owed Ngen, Eng and Wong a duty of care in his engineering and technology work to ensure work would be done lawfully and he was able to carry out the business purpose of Ngen.

135. Defendant breached his duty of care and, therefore, was negligent in not properly ensuring that his work was accurate and complete, which it was not. Hence several third party vendors had to be retained.

136. Ngen, Eng and Wong relied to their detriment on the inaccurate statements and work that Defendant showed them and hence his misrepresentations went undetected for close to two (2) years.

137. Defendant made knowingly false statements to Plaintiffs Ngen, Eng and Wong about his academic background, engineering and technology abilities, and the status of his work for Ngen.

138. Defendant made knowingly false statements about Ngen, Eng and Wong in an attempt to preserve his own innocence in a Sharksuit venture where his business misrepresentations were inexcusable to the public.

139. Defendant made knowingly false statements to the U.S.P.T.O as to his ownership rights to Ngen's intellectual property.

140. Defendant made the knowingly false statements to Ngen, Eng and Wong and third parties with the intention that they are relied on to give him rights and benefits that he did not deserve.

141. Lam, Eng and Wong had a special, privity-like relationship as members of Ngen and as a result of that relationship, Lam had a duty to impart true and accurate information to his partners regarding his true engineering and technology capacities, his status of work and his other business ventures that may conflict with Ngen.

142. Lam failed to take adequate steps to obtain further, accurate information for Ngen, Eng and Wong when requested. In fact, he always operated for self gain exemplified by his

sabotaging Ngen and using its and his partners' good name to protect himself in the Sharksuit venture and making public filings against the patent of Ngen amongst other actions.

143.  Ngen, Eng and Wong relied to their detriment on the misrepresentations of Defendant.

144. Ngen, Eng and Wong have suffered damages as a result of Lam's negligent misrepresentation, including lost profits, lost business opportunities, consequential and compensatory damages, among other damages.

WHEREFORE, Plaintiffs Ngen Smoke LLC, Ryan Eng and Eric Wong demand judgment against Defendant David Lam as follows:

(a)   A declaration that Defendant was properly disqualified and dissociated as a member of the LLC, along with a corresponding order expelling Defendant from Ngen Smoke LLC as a member, officer and employee;

(b)   Fixing the date of disqualification and disassociation as the date Defendant repudiated the Operating Agreement and oral agreement (and as such was first communicated to him on August 1, 2015);

(c)   An order declaring that the Ngen Smoke LLC patent, trademark, and other intellectual property filed in Application No. 29/514,974 belongs to Ngen Smoke LLC and ordering an assignment of that ownership from Defendant to Ngen Smoke LLC;

(d)   An order that Defendant must withdraw his opposition to Application No. 29/514,974 filed on September 24, 2015;

(e)    Fixing the amount owed to Defendant, if any, for the return of his member interest as the result of disqualification in light of his wrongful acts and the damage he has caused to Plaintiffs;

(f)    An award of compensatory and consequential damages;

(g)    An award of money damages against defendant in an amount sufficient to compensate Plaintiffs for their lost profits, lost business opportunities and other damages.

(h)    An award of punitive damages as may be permitted by law;

(i)    An award of attorney's fees as may be permitted by law;

(j)    An award of pre-judgment and post-judgment interest;

(k)    An award of costs of suit, and

(l)    An award of such other and further relief as the Court deems just.

Dated: New York, New York
       August 31, 2016

By: _____
    David S. Hong

LAW OFFICE OF DAVID S. HONG
350 West 42ND Street, Suite19H
New York, NY 10036
646-504-9494
david@davidhonglaw.com

*Attorneys for Plaintiffs Ngen Smoke LLC*
*Ryan Eng, and Eric Wong*

## DESIGNATION OF TRIAL COUNSEL

Plaintiffs Ngen Smoke LLC, Ryan Eng and Eric Wong hereby designate David Hong as trial counsel for plaintiffs in the within matter pursuant to R̲. 4:25-4.

## CERTIFICATION PURSUANT TO R. 4:5-1

I HEREBY CERTIFY, pursuant to R̲. 4:5-1 of the Rules Governing the Courts of the State of New Jersey that the above-entitled matter in controversy is not the subject of any other action pending in any court or arbitration proceeding, nor do the plaintiffs herein, Ngen Smoke LLC, Ryan Eng and Eric Wong, contemplate any such court or arbitration proceeding at this time, nor should any party known to the plaintiff be joined in this action at this time.

I FURTHER CERTIFY, that the foregoing statements made by me are true to the best of my knowledge, information and belief.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: New York, New York
        August 31, 2016

By: _____
    David S. Hong

LAW OFFICE OF DAVID S. HONG
350 West 42ND Street, Suite19H
New York, NY 10036
646-504-9494
david@davidhonglaw.com

You are currently viewing the printable version of this article, to return to the normal page, please click here.

# Crowdfunding websites exploited by scam artists as popularity soars

By Andrea Noble - *The Washington Times - Thursday, August 13, 2015*

When Katy Perry's infamous Left Shark awkwardly danced on stage during this year's Super Bowl halftime show, Laura Sirikul's first thought was: How can I get one of those costumes? Days later, she earnestly forked over $100 when she saw a crowdfunding campaign on Indiegogo promising to manufacture the cartoonish shark suit and to donate the proceeds to a nonprofit benefiting the environment.

But five months passed — as did prime opportunities such as the Discovery Channel's "Shark Week," the TV premiere of "Sharknado 3" and San Diego's massive Comic-Con — and there were still no shark suits.

Worse yet, creator David Lam had stopped posting online updates about the project. Had Ms. Sirikul and more than 1,000 others who donated to the project fallen for the latest online scam?

The popularity of crowdfunding websites has offered entrepreneurs and innovators a way to fund fledgling projects not otherwise possible by acting as a conduit for online donations. Crowdfunding platforms raised over $16 billion last year, and industry research estimates forecast that the figure could hit $34 billion this year.

But, perhaps inevitably, the lucrative crowdfunding sites also have become targets for scam artists, and none of the established or emerging platforms — including Kickstarter, Indiegogo and GoFundMe — seems to be immune.

Type "crowdfunding" and "scam" into a search engine, and the plethora of campaigns accused of dishonesty, or "scampaigns," quickly becomes apparent. Authorities have only recently been able to hold scam artists accountable.

Washington state Attorney General Bob Ferguson filed the nation's first consumer protection lawsuit against a crowdfunding campaign organizer in May 2014 after receiving

complaints about a Kickstarter campaign that never delivered a promised deck of custom-designed playing cards.

"When we began our investigation, it became clear to me that this was a case important not just for Washington state residents who lost out on their investments but to send a message as well that if you do business, you need to play by the rules," Mr. Ferguson said.

The problematic Kickstarter campaign, started by Edward J. Polchlopek in 2012, promised playing cards with custom artwork for backers in exchange for at least a $9 donation. Two years later, the campaign hadn't delivered the goods and Mr. Polchlopek had gone silent.

Prior to the attorney general's investigation, scorned donors had little recourse to address fraudulent campaigns other than to post information about scams online after the fact in an effort to prevent more, crowdfunding lawyer Kendall Almerico said.

"The prevailing logic has been the crowd will vet these projects themselves and find the people responsible," he said.

Last month, however, the judge overseeing the lawsuit ruled in the attorney general's favor, ordering Mr. Polchlopek's business to pay more than $54,000 — including civil penalties and reimbursement to the 31 Washington residents who donated to his campaign.

It's unclear whether Mr. Polchlopek deliberately intended to scam donors. The Tennessee businessman refused to communicate with prosecutors about the case, but Mr. Ferguson said it shouldn't matter whether a campaign intentionally defrauds consumers or simply is unable to finish the promised product.

"The bottom line is Kickstarter itself is very clear in its terms: You either provide the product, or if you bite off more than you can chew, under Kickstarter terms you need to provide a refund to the customers," Mr. Ferguson said.

For the Federal Trade Commission, which in June brokered a settlement agreement in its first crowdfunding case, whether deception or failure is behind a stalled crowdfunding campaign can make a difference in how the campaign creator is treated. But officials warn that it may take a hefty amount of sleuthing by wronged consumers to trigger an investigation.

"It's not always apparent on the face of things," said Sandhya Brown, assistant director of the FTC Division of Financial Practices. "A couple months past due — it's hard to know

what to make of that.

"At the end of the day, it's about the promises you are making and whether you are following through on those promises," Ms. Brown said.

Mr. Almerico said the self-policing among campaign backers has kept successful scams to a minimum — many are unmasked or shut down by platforms before they can collect much money — but he welcomes law enforcement.

"That hopefully raises their guard a little bit more," he said about would-be scammers.

### Inspiration strikes

The night Left Shark made a splash at the Super Bowl, David Lam wasn't even watching the game. But hours after the New England Patriots hoisted the Vince Lombardi Trophy, he noticed friends enthusiastically sharing video clips online of the shark's off-tempo dance moves, and inspiration struck.

"I saw it was viral," the 28-year-old aspiring engineer said. "My thoughts were, 'Why not use a popular meme for something that is good?'"

Mr. Lam said he had no experience crowdfunding a campaign when he sat down at 2 a.m. that morning and began hammering out the details of his idea on Indiegogo.

He was involved in another startup business and generally thought of himself as handy — he had sewn curtains and even designed and constructed his own Murphy bed. Why couldn't he make a shark suit? It didn't turn out to be that simple.

He went to sleep at 11 a.m. after staying up all night to work on the Indiegogo campaign. By the time he woke up, the campaign already had taken off.

"It just blew out of proportion," said Eunyce Kim, a 26-year-old friend of Mr. Lam's who put her skills as a social media marketer to use for the project in its first few weeks. "We were thinking we would make 100 [costumes]. And then it got really big."

With the help of glowing news coverage highlighting Mr. Lam's promise to donate proceeds to a nonprofit benefiting the environment, the Halftime Shark Suit project raised close to $93,000 from more than 1,200 donors.

The positive news reports, sponsorship by numerous companies and the pledge to donate to a good cause — factors that, authorities say, prospective donors should assess before sending money — encouraged Ms. Sirikul to give to the campaign.

"I was wary. I thought $100 is a lot, but I see he is backed by so many people and actual companies and so many credible websites were promoting him," the 31-year-old writer and researcher said.

Unlike crowdfunding campaigns promising too-good-to-be-true high-tech gadgets, a shark suit seemed technically feasible.

In the initial weeks of the campaign, Mr. Lam made some posts on the website — keeping donors informed about a project is strongly suggested in crowdfunding. But communication tapered off, and when deadlines for the campaign came and went with no progress, Ms. Sirikul became frustrated.

"I was expecting it to come in July, perfect for Comic-Con," she said. "Then, as the months go on, I'm realizing I'm not going to get this before Comic-Con."

She sent a message to the email address on the account. Then she tried calling Indiegogo. Nothing.

Eventually, she posted a petition online demanding that the campaign refund donors' money.

## A cautionary tale

On Mr. Lam's end, things were falling apart. He said he never intended to scam donors. He also didn't want to become the target of their wrath.

Mr. Lam initially recruited a team that included a fashion designer, an industrial design student and a social media specialist who met on weekends to work on the project. But the momentum started to fade, and Mr. Lam had less time to dedicate to the project as work ramped up on a different startup venture with which he was already involved.

Complicating matters, Mr. Lam said, he hit a hurdle early in the process when someone broke into his car and stole nearly $4,000 worth of laptop computers and other equipment from the startup. He needed to take on jobs as a waiter and an Uber driver to pay back his partners for the losses.

In the meantime, the failing campaign began to take its toll.

Donors questioned whether Mr. Lam had taken the money and run. People posted information online about him. They tracked down and bad-mouthed his startup. He said his partners eventually asked him to distance himself from the crowdfunding project because of concerns about bad publicity.

"I just didn't think it was going to blow up and become this witch hunt," Mr. Lam said. "I don't know what other word to use, but that's how I feel."

Ms. Sirikul's persistence and her online petition eventually got her into contact with Mr. Lam. The two discussed possible remedies, including outsourcing production of the shark suits to an established company to fulfill the crowdfunding orders.

Mr. Lam said he did make progress on the shark suits, finishing a prototype and finding manufacturers that could make the costumes, but he worried that going forward would further jeopardize his startup project. In the end, Mr. Lam said, he just wanted the campaign to be over.

"If I could make everything go away, I would want Indiegogo to refund everyone," he said during an interview last month.

Less than a week later, an update was posted on the Halftime Shark Suit campaign Web page notifying donors that refunds were forthcoming. The July 26 post was the last update on the campaign.

### Terms of use

Even with the refund process for the Halftime Shark Suit campaign — confirmed by an Indiegogo spokesman — disgruntled investors won't be getting back all of their money.

Mr. Lam said he spent very little of the money he collected and that no more than $1,000 went toward advertising and materials for the shark suit prototype. That should leave the bulk of the cash available for return. But as part of its business model, Indiegogo will keep a portion of the money that the campaign raised.

The practice of keeping a cut of the money raised differs slightly among crowdfunding platforms. Indiegogo charges a 5 percent fee to campaigns that reach their fundraising goals and can charge campaigns that don't reach their goals depending on options the organizer selects. Kickstarter distributes funds to organizers only if they meet their

monetary goals. In that case, it charges a 5 percent fee. If the goal is not met, the fees are refunded and the company takes no cut. Both platforms assess payment processing fees.

Based on those figures, Mr. Lam estimates that he will be able to refund 85 percent to 90 percent of the amount donated to his campaign — all of which he will have to process himself because Indiegogo takes no part in issuing refunds. On Monday, Mr. Lam said he is working this week to verify donors' contact information so he can begin issuing refunds.

Returning money to donors is the top priority in fraudulent crowdfunding cases that the FTC pursues, even though a full refund can't always be expected even in those cases, Ms. Brown said.

## No guarantees

On their end, crowdfunding platforms try to educate prospective backers that donating to a campaign is not the same as a straightforward purchase and to warn them about scams.

"People aren't buying things that already exist — they're helping to create new things," reads an entry on Kickstarter's Trust and Safety Web page. "Some projects will go wonderfully, and others will run into obstacles. Be prepared for a little bit of each."

Indiegogo's own terms of use ban scams and fraudulent projects. But they also explicitly state that there is no guarantee that contributions will be used as promised and that the company is under no obligation to intervene in any disputes between campaign organizers and donors.

"The platforms themselves like Kickstarter and Indiegogo, they disclaim any responsibility for anything put up on their site," Mr. Almerico said.

Distancing themselves from campaign operations gives platforms legal protections from regulators and lawsuits, Mr. Almerico said.

Asked during an interview whether the company would, or could, take any sort of action to compel a campaign owner to refund money, a spokesman for Indiegogo read off a list of the terms of agreement — none of which explicitly answered the question.

"In the event of any dispute, such as a Campaign Owner's alleged failure to comply with the Terms or alleged failure in fulfillment of a Perk, we may provide the Campaign Owner's contact information to the Contributor so that the two parties may resolve their dispute," Indiegogo's terms of use state.

in the case of Mr. Lam, the company confirms communication with him about the refund process.

"We have provided him clear guidance on how to issue refunds and effectively communicate with his customers to resolve any deliverability challenges and issues between him and contributors as quickly as possible," reads a statement provided by Julian Wong, the head of the trust and safety division at Indiegogo.

When asked whether the platforms should bear some accountability for fraudulent campaigns, the Washington state attorney general said it is a conversation worth having.

"I think crowdfunding sites can be wonderful opportunities for investors and sellers," Mr. Ferguson said, reiterating that he is not trying to stifle use of the various fundraising platforms. "With new technology and new ideas, it's important to see if we have the right regulatory system in place to protect consumers."

But for the donors stuck in the middle of a campaign dispute, there is little solace in regulatory victories or tough talk from crowdfunding platforms until the money is returned.

"I feel like it wasn't a scam initially. I think initially he thought he could do this because he hasn't run away with the money and could have not responded at all," Ms. Sirikul said of Mr. Lam's shark suit campaign. "I got fed up. A lot of people just want their money back. I just want my money back."

© Copyright 2015 The Washington Times, LLC. Click here for reprint permission.